# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | |
| | : | **Criminal No.  1:20-cr-00103 (RDM)** |
| **GEORGE A. NADER,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' SENTENCING MEMORANDUM

George A. Nader ("defendant") and co-defendant Andy "Ahmad" Khawaja orchestrated a scheme to funnel over $3.5 million in foreign funds into the 2016 presidential election.  They did so to gain direct access to unsuspecting high-level political figures to further their professional endeavors:  In the defendant's case, out of a desire to lobby on behalf and advance the interests of his client, the government of the United Arab Emirates ("UAE"); in Khawaja's case, in the hopes of securing political appointment in the future.  Pursuant to the conspiracy, the defendant transferred millions of dollars that he obtained from the UAE government to Khawaja, under the guise of a false licensing agreement, and Khawaja made the contributions under his name, his wife's name, and through his associates as part of a derivative conduit contribution scheme.  As the defendant and Khawaja executed the scheme, the defendant brazenly reported in real time to senior UAE officials about his efforts to gain influence in the United States on their behalf.  The defendant's scheme violated core prohibitions of our federal elections law, thereby undermining our nation's commitment to and promise of elections free from foreign interference and the appearance of corruption.  In the process, the defendant caused several political committees to unwittingly submit false reports to the Federal Election Commission ("FEC"), further undermining our nation's commitment to transparency in funding of our federal elections.

The government, by and through the undersigned attorneys for the Public Integrity Section,

Criminal Division, United States Department of Justice, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("U.S.S.G." or the "Guidelines") § 6A1.2, files this Sentencing Memorandum in connection with the defendant's sentencing. The government requests that the Court find a Total Offense Level of 27 and a Criminal History Category II, resulting in a Guidelines range of 78 to 97 months, and that it sentence the defendant to 60 months of incarceration. The government further requests that this sentence run consecutively to the defendant's undischarged term of imprisonment in the Eastern District of Virginia for sex-related crimes involving minors, given the disparate nature of the offenses, both of which involve serious violations of federal criminal law. Such a sentence would be sufficient, and not greater than necessary, to satisfy the factors set forth in 18 U.S.C. §§ 3553 and 3584.

## I.      PROCEDURAL HISTORY

### A.      The Defendant's Conviction in the Eastern District of Virginia

On or about January 17, 2018, the defendant was charged via criminal complaint in the Eastern District of Virginia with one count of Transportation of Visual Depiction of Minors, in violation of 18 U.S.C. § 2252(a)(1) and (b)(1). Criminal Complaint, ECF No. 1, 1:19-cr-201. Approximately 18 months later, on or about June 3, 2019, the defendant was arrested at the John F. Kennedy International Airport in the State of New York. Arrest Warrant, ECF No. 19, 1:19-cr-201. On or about June 7, 2019, the defendant was denied bail and remanded to the custody of the U.S. Marshals Service. Detention Hearing, ECF No. 139, 1:19-cr-201. The defendant has remained in custody in the Eastern District of Virginia since that time.

On or about July 3, 2019, a federal grand jury sitting in the Eastern District of Virginia returned a true bill charging the defendant with one count of Transportation of Visual Depictions

of Minors, in violation of 18 U.S.C. § 2252(a)(1) and (b)(1); one count of Transportation of Obscenity, in violation of 18 U.S.C. § 1462; and one count of Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, in violation of 18 U.S.C. § 2423(a). Indictment, ECF No. 49, 1:19-cr-201. Counts One and Two of the Indictment related to electronic media seized from the defendant's phone in 2018; Count Three related to the transportation of a minor from Europe to the United States for the purpose of engaging in criminal sexual activity in and around February 2000. *Id.*

On or about January 13, 2020, the defendant pled guilty to a two-count Information charging him with one count of Possession of Visual Depictions of Minors, in violation of 18 U.S.C. § 2252(a)(4) and (b)(2), and one count of Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, in violation of 18 U.S.C. § 2423(a). Information, ECF No. 165, 1:19-cr-201. Pursuant to the plea agreement, the parties agreed to jointly recommend a sentence of ten years' imprisonment, to run concurrently, for each count. Plea Agreement, ECF No. 171 at 4, 1:19-cr-201. On or about June 26, 2020, Judge Leonie M. Brinkema, United States District Judge for the Eastern District of Virginia, sentenced the defendant to a term of 10 years' imprisonment for each count, "to run concurrently" and "with credit for time served." Judgment, ECF No. 197 at 2, 1:19-cr-201.[1]

### B.    The Defendant's Conviction in the District of Columbia

On November 7, 2019, a fifty-three count Indictment was returned in the instant case charging eight defendants, including the defendant, with conspiracy to commit offenses against

---

[1] ███████████████████████████████████████████

the United States, making conduit contributions, making excessive contributions, causing the submission of false statements, causing the submission of false records, and obstruction of justice. Indictment, ECF No. 1, 1:19-cr-374.

On July 22, 2020, the defendant pled guilty to a one-count Information in the above-captioned matter, charging a violation of 18 U.S.C. § 371.  ECF No. 9, 1:20-cr-103.  Following the defendant's guilty plea in this case ███████████████████████████████████ ███████, this Court set a sentencing hearing for November 5, 2021.  ECF Minute Entry, 1:20-cr-103, October 5, 2021.

## II.    FACTUAL BACKGROUND[2]

The Court is familiar with the defendant's substantial criminal conduct, as detailed in the Statement of Offense (ECF No. 10) and the Presentence Investigation Report ("PSR") at paragraphs 14 through 89.  The government, therefore, provides only an abbreviated recitation of facts for the Court's consideration.

The defendant is a Lebanese-American businessman, lobbyist, and convicted sex offender (both in the United States and the Czech Republic).  The defendant has significant ties to the government of the UAE, including serving as an advisor to senior UAE officials, and has acted as an unofficial liaison between U.S. officials and Middle Eastern officials in the past.  *See* Exhibit Three at 26–32; *see also* Special Counsel Robert S. Mueller, III, Report on the Investigation into Russian Interference in the 2016 Presidential Election ("Mueller Report"), Vol. I at 147-48 (March 2019).

---

[2]    To the extent that any facts described in this section are not sourced to the defendant's Statement of Offense (ECF No. 10), the government will be prepared to proffer investigative materials in support thereof at sentencing upon the Court's request.

Khawaja was the Chief Executive Officer of an online payment processing company headquartered in West Hollywood, California ("Company A"), *see* ECF No. 10 ¶ 2, who was eager to gain influence with high-level political figures in the hopes of securing a political appointment in the future.  For his part, the defendant also had a strong interest in accessing high-level political figures in the United States for the purpose of advancing the interests of his client, the UAE government.  As such, the defendant and Khawaja made an arrangement in the summer of 2016 whereby the defendant would make available millions of dollars in UAE funds to Khawaja who, in turn, would use the foreign funds to make campaign contributions in the United States to access—and, at times, to host—political events in an effort to gain influence with high-level political figures, including Candidate 1, a candidate for the Office of the President of the United States in the 2016 election.  *Id.* ¶ 9.

As part of this arrangement, the defendant attended several political fundraisers and events as Khawaja's guest and often reported back to senior UAE officials about his contacts with high-level political figures.  Thus, for example, following an event on May 6, 2016, at Khawaja's home with an official from Candidate 1's campaign and another high-profile elected official, the defendant reported to a senior UAE official via WhatsApp message:  "Had a magnificent sessions [sic] with [Candidate 1]'s key people. . . . You will be most amazed by my progress on that side." *Id.* ¶ 15.  Similarly, on or about June 7, 2016, the defendant once again reported the following to a senior UAE official via WhatsApp message:  "Had a terrific meeting with [Candidate 1].  You will be most delighted!"  *Id.* ¶ 21.

The defendant's coordination with UAE officials was often conducted prior to the defendant's influence activities in the United States.  Thus, for example, on or about June 2, 2016,

the defendant sent the following to a senior UAE official via WhatsApp message: "leaving very early morning to catch up with [Candidate 1] over the weekend. . . . Can I come over for 10 minutes . . . to get your blessing and instruction before I leave please?" *Id.* ¶ 19. Similarly, on or about June 24, 2016, the defendant reported to a senior UAE official via WhatsApp message: "traveling on Sat morning to catch up with [Candidate 1] and [his/her spouse]: I am seeing him on Sunday and her in Tuesday Sir! Would love to see you tomorrow at your convenience . . . for your guidance, instruction and blessing!" *Id.* ¶ 29. Following these encounters, the defendant reported to a senior UAE official that the "[m]eeting with [Candidate 1's spouse] was superb!" and the "[m]eeting with [Candidate 1] went extremely well." *Id.* ¶ 31.

The defendant's reports to UAE officials about his influence activities in the United States continued in the ensuing months. Thus, for example, on or about August 23, 2016, the defendant reported to a senior UAE official via WhatsApp message: "I just had dinner with [Candidate 1] and had a very very productive discussion with [him/her]." *Id.* ¶ 47. Similarly, on or about September 12, 2016, Khawaja sent a WhatsApp message to the defendant stating that he was on the telephone with Candidate 1's campaign. Khawaja recorded part of his telephone call with the campaign and sent it to the defendant who, in turn, forwarded the recording to a senior UAE official via WhatsApp. *Id.* ¶ 53. Lastly, following an event hosted by Khawaja with Candidate 1, the defendant reported on or about October 13, 2016, to a senior UAE official via WhatsApp message: "Had a simply Terrific Magnificent brainstorming and discussion with [Candidate 1] This evening!" *Id.* ¶ 56.

The defendant and Khawaja made over $3.5 million in campaign contributions using funds that the defendant obtained from the UAE to secure this level of access. To do so, however, they

took significant steps to conceal the true source of the funds and to effectively circumvent campaign finance limits and controls. Specifically, they concocted a plan whereby the defendant's company invoiced Company A in an attempt to disguise the transfer of UAE funds to Khawaja as a legitimate commercial transaction. As described by the defendant in a message to Khawaja: "Hi Andy As per our conversation and agreement for consultation and services provided by your company kindly send me the bill to my email address [. . .]  so we can take care of it ASAP! Specify in bill method and full details of payment please. As already mentioned half of 10 to be paid upon receipt and second half by 15 August!"  *Id.* ¶ 26.  On or about June 15, 2016, an employee of Company A and close associate of Khawaja sent the defendant an email attaching an invoice from Company A for €10 million for a supposed license of Company A's software by one of the defendant's companies. *Id.*  This was a sham invoice as the parties never contemplated any such licensing and no such licensing—or other services for that matter—ever took place. Pursuant to this sham invoice, Company A received a €2.5 million ($2.77 million) wire transfer on or about July 18, 2016, *Id.* ¶ 40, and another €1.941 million ($2.14 million) wire transfer on or about August 24, 2016.  *Id.* ¶ 48.

Three days after the second payment was wire transferred to Company A, the defendant told Khawaja via WhatsApp message:  "I have conveyed to [senior UAE official] . . . your commitment and promise to hold the upcoming two events in coming weeks:  One in LF[3] 2. One in NY and they you are on top of it!  This is the priority right now before Anything else and any further commitment."  *Id.* ¶ 49.  Within days of receiving this WhatsApp message, Khawaja began

---

[3]     The government has confirmed that "LF" was a reference to "LV," which was intended as shorthand for Las Vegas, Nevada.

planning a private event for Candidate 1 in Las Vegas, Nevada, which was ultimately held on October 12, 2016, and required him to raise or contribute a baseline of $500,000 for two political committees affiliated with Candidate 1 to host the event, *Id.* ¶ 50, with an ultimate goal of raising $1 million for the campaign.

However, because Khawaja had already contributed to these political committees the maximum amount that was legally permissible, he could not simply write a check using the UAE funds that he received from the defendant.  Instead, Khawaja gave approximately $1 million to seven associates for them to make campaign contributions to one of the political committees in their names, thereby concealing the true source of the contributions from the recipient political committee, the FEC, and the public.  *Id.*  This caused the recipient political committee to unwittingly file a false report with the FEC stating that the contributions were from Khawaja's seven associates when they were, in fact, from Khawaja using the UAE funds that he had received from the defendant.  Although the defendant was not directly involved in Khawaja's derivative conduit contribution scheme, a September 8, 2016, WhatsApp message suggests that he was, at best, willfully blind as to it: "Don't give up any Baklava[4] in my name till I come over and discuss it in person!  You handle it for now in your <u>resilient and creative manner!</u>" (emphasis added.)  To which Khawaja responded:  "Don't worry Will not."  *Id.* ¶ 51.

The defendant's efforts to gain influence was not limited to Candidate 1.  Thus, for example, in a July 27, 2016, WhatsApp message to a senior UAE official, the defendant noted that he was "catching up with key figures in both camps and have been developing a steady, consistent

---

[4]     The government has confirmed that the term "Baklava" refers to UAE funds sent to Khawaja as part of the defendant's influence activities in the United States.

and constructive relationship with both camps!" *Id.* ¶ 41.  Similarly, following the 2016 presidential election, Khawaja caused Company A to contribute $1 million to the President-Elect's inaugural committee.  In connection with his contribution, Khawaja obtained tickets to the 2017 U.S. Presidential inauguration in January 2017, which he attended with the defendant as his guest. *Id.* ¶ 58.

## III.   STANDARDS GOVERNING SENTENCING

The standards governing sentencing are well-established.  In *United States v. Booker*, 543 U.S. 220, 264 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision.  *See also United States v. Kimbrough*, 552 U.S. 85, 90 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").  In *Gall v. United States*, 552 U.S. 38, 49–50 (2007), the Supreme Court instructed that sentencing courts should calculate the sentencing Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors.  The *Gall* Court further instructed that, in the event that the sentencing court decides to vary from the Guidelines, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."   552 U.S. at 50 (noting that a "major departure should be supported by a more significant justification than a minor one").

## IV.   APPROPRIATE GUIDELINES RANGE

The parties agree with the Guidelines calculations set forth by the U.S. Probation Office, resulting in a total offense level of 27.  PSR ¶ 131; *see also* ECF No. 9 at 3 (setting forth the parties'

agreed-upon estimated offense level of 27). The government further agrees with the United States Probation Office's determination that the defendant's criminal history, which reflects his conviction in the Eastern District of Virginia, qualifies for Criminal History Category II, resulting in a Guidelines range of 78 months to 97 months. PSR ¶ 191. Lastly, in light of the statutory maximum sentence of 60 months under 18 U.S.C. § 371, the government requests a sentence of five years' imprisonment.

## V.     THE 18 U.S.C. SECTION 3553(A) FACTORS

Under 18 U.S.C. § 3553(a), the goal of sentencing is to impose a sentence that is "sufficient, but not greater than necessary." After calculating the defendant's advisory Guidelines range, the Court considers factors under Section 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, just punishment, and adequate deterrence. 18 U.S.C. § 3553(a).

### A.     Nature and Circumstances of the Offense

The defendant's conduct—as described and stipulated to by the defendant in the Statement of Offense (ECF No. 10)—violated several prohibitions of the Federal Election Campaign Act of 1971 ("FECA"), 52 U.S.C. § 30101 *et seq.* The defendant was initially charged with only one substantive violation of FECA—that is, FECA's prohibition on contributions made in the name of another (52 U.S.C. § 30122).[5] However, as detailed above, his admitted conduct also violated FECA's prohibitions on excessive contributions (52 U.S.C. § 30116), corporate contributions (52 U.S.C. § 30118), and—most importantly for sentencing purposes—foreign contributions (52 U.S.C. § 30121). *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[A] sentencing

---

[5]      In addition to this Title 52 charge, the defendant was charged with several counts of non-FECA violations under 18 U.S.C. §§ 371, 1001, and 1519.

judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.") (collecting cases).

Critically, the defendant's admitted conduct violated FECA's central goal of protecting our electoral system from foreign influence. *See Bluman v. FEC*, 800 F. Supp. 2d 281, 282–84 (D.D.C. 2011) (Kavanaugh, J., for a three-judge District Court) (describing congressional intent to limit foreign influence over American elections and holding that FECA's ban on foreign contributions and expenditures "readily passes constitutional muster"), *aff'd*, 565 U.S. 1104 (2012); *see also United States v. Singh*, 979 F.3d 697, 709–10 (9th Cir. 2020) (detailing the genesis of § 30121 and the growing concern in the United States Congress over foreign influence in U.S. elections). As noted, the defendant used UAE funds to cause over $3.5 million in illegal campaign contributions that, in turn, granted him access to unsuspecting high-level officials and political candidates in the United States whom the defendant lobbied on behalf of the UAE. Without question, the defendant's conduct in this respect is a direct affront to FECA's critical goal of protecting our elections from foreign influence, and the government respectfully urges the Court to take this into consideration when formulating a fair and appropriate sentence.

**B.    The History and Characteristics of the Defendant**

There is nothing about the defendant's upbringing, family, schooling, or financial circumstances that mitigates his crimes. The defendant's conduct is not the unfortunate result of a difficult childhood or dire financial or familial need. To the contrary, the defendant committed these crimes for the purpose of advancing his career and financial position, by gaining access to "both camps" of the 2016 presidential electoral landscape so that he could advance the interests of

his client, a foreign government.  *See* Mueller Report, Vol. I at 148 (noting that Nader had "developed contacts with both U.S. presidential campaigns during the 2016 election").  Lastly, the defendant's crimes in this case are layered on top of a long history of sex-related crimes involving minors in the United States and abroad.

To the extent that the defendant directs the Court's attention to his work as a liaison between U.S. officials and Middle Eastern authorities, his involvement in high-profile diplomatic endeavors on behalf of the United States, or his familial ties, education, and specialized skills in an effort to secure leniency, *see* Exhibit Three at 26–32, the Guidelines generally disfavor any such consideration in fashioning a sentence.  *See* 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to . . . socioeconomic status of offenders."); U.S.S.G. § 5H1.10 (socioeconomic status not relevant); *see also* U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant). Federal courts have repeatedly agreed.  *See, e.g.*, *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Kuhlman,* 711 F.3d 1321, 1329 (11th Cir. 2013) (vacating sentence of white collar criminal, stating, "[t]he Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status . . . unavailable to defendants of lesser means.").

Without question, the defendant has had a unique professional journey, including involvement in high-profile diplomatic episodes involving American interests.  None of that

experience is relevant to this Court's consideration of an adequate sentence.  To the contrary, as discussed below, the defendant's extensive experience in this respect heightens the risk of recidivism of the instant conduct.

### C.    The Need for Deterrence

As noted, the defendant has strong personal and professional connections to the Middle East.  These connections include advisory roles serving the highest echelons of the UAE government.  At the same time, illegal foreign involvement in our electoral system is a substantial concern.  *See, e.g.*, *United States v. Benton*, 21-cr-00569 (D.D.C. 2021) (pending trial); *United States v. Parnas*, 19-cr-00725 (S.D.N.Y. 2019); *United States v. Singh*, 14-cr-0388 (S.D. Cal. 2014).  Accordingly, the need for specific deterrence is paramount in this case as is general deterrence of those who would engage in similar conduct.  *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (district court correctly considered pertinent sentencing factors when it, among other things, "explained that the sentence would deter Fry and others who may be inclined in doing similar kinds of things" (internal quotations omitted)); *United States v. Jackson*, 848 F.3d 460, 466–67 (D.C. Cir. 2017) (citing 18 U.S.C. § 3553(a)(2)(B) and (C), the question for the sentencing court is whether the sentence is "sufficiently stiff to deter [the defendant] and others from committing similar crimes in the future").

The risk of recidivism by this defendant is appreciable.  During his presentence interview, the defendant "referred to the to the circumstances leading to his arrest in the Eastern District of Virginia as a 'political witch hunt,' noting the extreme age of the underlying conduct and the proximity of that investigation to his role in the Mueller investigation."  PSR ¶ 113.  The defendant, through counsel, subsequently expressed remorse for making this statement and reiterated that he

13

is regretful and accepts full responsibility for the conduct in the instant case. PSR at p. 52. Whether the defendant is remorseful of his conduct in the Eastern District of Virginia case is of limited relevance for sentencing purposes in this case; after all, the criminal conduct for which he was convicted in that case has no resemblance whatsoever to his criminal conduct in this case.

What is both concerning and revealing about the defendant's statement, however, is his troubling lack of contrition regarding the gravity of the crimes he committed, even following the entry of a guilty plea. In fashioning a sentence that is sufficient to deter the defendant from committing future offenses, the Court can and should consider the defendant's apparent failure to appreciate the seriousness of his crimes in the Eastern District of Virginia. The Court should also weigh the defendant's apparent willingness to baselessly attribute his prosecution to supposed political considerations, and not to his own repeated unlawful conduct.

The defendant is sixty-one years old and may well resume his advisory work for foreign governments upon release from custody. Accordingly, it is of paramount importance that the defendant's sentence adequately reflect the gravity of his crimes so as to deter him and others who are similarly situated from engaging in this type of conduct in the future.

## VI.    A CONSECUTIVE SENTENCE IS WARRANTED

The defendant's sentence in this case is presumed to run consecutively to his sentence in the Eastern District of Virginia unless the Court orders otherwise. 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently."). Whether the Court runs the terms concurrently or consecutively is determined by a consideration of the § 3553 factors. 18 U.S.C. § 3584(b) ("The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being

imposed, the factors set forth in section 3553(a).").  The relevant sentencing guideline is U.S.S.G. § 5G1.3, "Imposition of a Sentence on a Defendant Subject to an Undischarged Term of Imprisonment or Anticipated State Term of Imprisonment," which "operates to mitigate the possibility that the fortuity of two separate prosecutions will grossly increase a defendant's sentence." *Witte v. United States*, 515 U.S. 389, 405 (1995).

With respect to U.S.S.G. § 5G1.3, it is readily apparent that subsection (a) is inapplicable because the defendant's instant offense was not committed while serving his term of imprisonment in the Eastern District of Virginia.  Nor do subsections (b) or (c) apply as the conduct underlying his conviction in that District does not meet the definition of "relevant conduct" for purposes of the instant offense pursuant to subsections (a)(1), (a)(2), or (a)(3) of U.S.S.G. § 1B1.3. Accordingly, the policy statement in subsection (d) applies:

> In a case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

U.S.S.G. § 5G1.3(d); *see also* PSR ¶ 192.  Moreover, Application Note 4(A) to § 5G1.3 articulates five factors that a sentencing court should consider as part of its analysis:

**(i)**   the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));

**(ii)**   the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;

**(iii)**   the time served on the undischarged sentence and the time likely to be served before release;

**(iv)**   the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and

**(v)**   any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

U.S.S.G. § 5G1.3, cmt. n.4(A).

Based on the foregoing, and for the reasons articulated in Part V, *supra*, the defendant's sentence in the instant case should run consecutively to his term of imprisonment in the Eastern District of Virginia. ███████████████████████████████████

███████████████████████ for conduct that is wholly unrelated to the conduct for which he is being sentenced in the instant case.  Because there is no nexus between the conduct for which the defendant is presently incarcerated and the conduct underlying this case, a consecutive sentence is necessary and appropriate, particularly given "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  *See* 18 U.S.C. § 3553(a)(2).  This is particularly so given the seriousness of the defendant's crimes, which involved the concealed movement of millions of dollars in foreign funds into a United States presidential election on behalf of a foreign power, and the need to deter the defendant and others from engaging in such conduct in the future.

Should the Court run the defendant's sentence in this case concurrently, and assuming he is given credit for time served, ████████████████████████████████████████

██████████████████████████████ for both the sexual exploitation of minors as well as the serious affronts to our electoral system.  In effect, the defendant would get no additional punishment, beyond any financial penalties the Court may impose, for his grave conduct in the instant matter. The § 3553(a) factors compel a different result.

## VII.   CONCLUSION

The federal election laws prohibit foreign nationals from making campaign contributions in federal elections and prohibit anyone from making campaign contributions in the name of another.  They further require accurate reporting of the sources of campaign contributions.  A central purpose of these laws is to guard the political process and electoral system from foreign

16

interference and to adequately inform candidates for office, their campaigns and committees, federal regulators, and the public at large of the true source of campaign contributions flowing into the electoral process. The defendant's conduct violated all of these imperatives and reflected a sustained and sophisticated effort to undermine the integrity of a federal election.

Accordingly, the government hereby requests a sentence that adequately reflects the gravity of the defendant's crimes, the need for specific and general deterrence, and the other § 3553(a) factors. Specifically, the government respectfully requests that the Court determine that the defendant's Guidelines offense level is 27 and his Criminal History Category is II. The government further respectfully requests that, taking into consideration the sentencing factors set forth in sections 3553 and 3584, the Court sentence the defendant to a term of 60 months of incarceration to run consecutively to the term of imprisonment that he is currently serving in the Eastern District of Virginia.

Respectfully submitted,

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By:    */s/ Victor R. Salgado*
**Victor R. Salgado**
D.C. Bar No. 975013
Senior Litigation Counsel
**Michelle K. Parikh**
Trial Attorney
D.C. Bar No. 1044532
Public Integrity Section
Criminal Division
U.S. Department of Justice

17

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of this filing was served by email upon counsel for the

Defendant on this day.


Dated:  November 2, 2021                          */s/ Victor R. Salgado*
                                                 Victor R. Salgado
                                                 Public Integrity Section
                                                 Criminal Division
                                                 U.S. Department of Justice

# EXHIBIT ONE

**[REDACTED]**

# EXHIBIT TWO

**[REDACTED]**

# EXHIBIT THREE

**[REDACTED]**

# EXHIBIT FOUR

**[REDACTED]**